Filed 5/28/14  Aklikokou v. Department of Transportation CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AUSMILA AKLIKOKOU et al., | |
| Plaintiffs and Appellants, | G049336 |
| v. | (Super. Ct. No. CIVSS 809400) |
| DEPARTMENT OF TRANSPORTATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino County, John M. Pacheco, Judge.  Affirmed in part and reversed in part.

Jeffrey S. Pop & Associates and Jeffrey S. Pop for Plaintiffs and Appellants.

Ronald W. Beals, Linda Cohen Harrel and Mark A. Berkebile for Defendant and Respondent.

# INTRODUCTION

This appeal arises from a judgment entered after a trial in which the jury found in favor of the California Department of Transportation (Caltrans) and against Ausmila and Hansel Aklikokou (appellants) on public entity liability. Appellants alleged their injuries – incurred when their father, Kokou Aklikokou, rolled the car in which they were passengers – were caused by a dangerous condition of public property. By special verdict, the jury found no dangerous condition existed.

Before trial, the court granted Caltrans summary adjudication on several alleged causes of the accident, on the ground of design immunity. As a result, appellants could not present these issues to the jury. They argue on appeal that the motion for summary adjudication was improperly granted, because there were triable issues of fact, and that the presentation of their case to the jury was thereby "eviscerated."

We agree the trial court should not have granted Caltrans' summary adjudication motion on design immunity. The motion did not dispose of the entire cause of action, as required by Code of Civil Procedure section 437c, subdivision (f)(1). There were still aspects of the cause of action to be determined by the trier of fact. The order granting summary adjudication must therefore be reversed.

This does not, however, end the story. Although a trial court may not grant summary adjudication in bits and pieces, it is required to determine what evidence should be presented to the jury. In this case, the court – relying on the ruling on the motion for summary adjudication – granted Caltrans' motion in limine to exclude evidence that ran counter to design immunity. In their opposition to the motion for summary adjudication, the appellants had presented no evidence to support a triable issue of fact as to the first two elements of design immunity. Because the third element was a question for the trial court and because sufficient evidence supported the court's decision, the motion in limine was properly granted.

Appellants also asserted that Caltrans had lost its design immunity. Taking the existence of design immunity away from the jury did not prevent appellants from offering evidence regarding the subsequent loss of design immunity, and, in fact, the evidence of changed physical conditions on which they based this argument went to the jury. The jury decided that the physical conditions were not dangerous. Appellants therefore had their proper day in court, and we affirm the judgment.

**FACTS**

The accident that is the subject of this appeal took place on Interstate 40 in the desert near Barstow during July 2007.[1] Kokou Aklikokou was driving east in a Chevrolet Lumina; appellants were asleep in the back seat. The car drifted into the left lane and onto the left shoulder. Aklikokou then steered too far to the right, onto the right shoulder. The car hit a drainage dike on the right side of the highway and became airborne, landing on a slope (the embankment) and rolling over three times before coming to rest. Both appellants were seriously injured; Ausmila is a quadriplegic.[2]

Appellants sued Caltrans, alleging a dangerous condition to public property. Specifically they alleged Caltrans had failed to install a guardrail at the accident site and had not reduced or minimized the slope of the embankment on the right side. (The guardrail was necessary because of the steep slope of the embankment.) In addition, Caltrans had not properly maintained the embankment in the years following the road's construction.

Caltrans moved for summary judgment in September 2009. The trial court denied this motion because it was a motion for summary judgment, not summary adjudication. As the court explained, it believed Caltrans had established design immunity with respect to the absence of a guardrail. Because other components to the

---

[1] Interstate 40 in the area where the accident occurred runs east and west through desert terrain. It has two lanes on each side, separated by a broad dirt median with native materials.

[2] Kokou Aklikokou later told the CHP officer investigating the accident at the scene that he was feeling tired and believed he fell asleep.

3

accident had not been addressed, however, Caltrans' evidence did not dispose of the entire complaint. Therefore the court could not grant summary judgment.

Appellants filed an amended complaint in December 2010. To the previous allegations, they added more detail about the dike on the side of the road, alleged to be six inches above the roadway. In the absence of a guardrail, a car would collide with the dike, would "trip" and become airborne, then land on the excessively steep slope of the embankment and roll over.

Caltrans moved for summary judgment and for summary adjudication on design immunity in May 2011 before a different judge.[3] The motion dealt with both the guardrail and the dike issues of the new complaint. Appellants opposed the motion on the grounds that (1) triable issues of fact existed as to design immunity and (2) Caltrans had lost design immunity owing to changed conditions. The opposition also introduced the lack of "shoulder backing" into the mix of causes for the accident.[4]

In August 2011, the trial court denied Caltrans' motion for summary adjudication on the issues regarding the absence of shoulder backing and the maintenance of the embankment. The court found triable issues of fact as to "whether this failure to provide [shoulder backing] and maintain the embankment so a recovery area was present created a dangerous condition." The court granted Caltrans' motion on the basis of design immunity for the allegations regarding the absence of a guardrail, the original design of the embankment, and the installation of the dike.

Appellants moved for reconsideration of the decision on summary adjudication in August 2011. The court held a hearing in September on this motion, during which counsel reargued portions of the summary adjudication motion. At the end

---

[3] Appellants have argued the court should not have entertained this motion, because Caltrans had already moved for summary judgment, and the motion had been denied. Because we reverse the order on different grounds, we do not address this argument.

[4] Shoulder backing is material, such as gravel, placed next to the asphalt between the edge of the pavement and the point at which the embankment begins to slope downward. It provides a level recovery area in case a vehicle runs off the road. It also supplies lateral support for the edge of the pavement.

4

of the hearing, the issues had been clarified – design immunity applied to the design issues (the guardrail, the dike, the design of the embankment) but did not foreclose appellants' case on failure to maintain the slope of the embankment over the years such that it became dangerously eroded. The court set November 7 as the trial date, later continued to November 9.

Between the hearing in September and the trial date, the parties disputed the wording of the summary adjudication order. The court held yet another hearing on the scope of the summary adjudication motion just before trial, on October 31. The parties continued to dispute the wording of the order even after October 31. As a result, although the motion was granted in August, the court did not enter an order until November 10, 2011, after the trial had started.

On the first day of trial, before voir dire began, appellants' counsel introduced a new wrinkle. Although the slope of the embankment on the road's right side had always been in the case and the lack of shoulder backing on the right side was an issue at least as of the motion for summary adjudication, counsel now argued that lack of shoulder backing on the *left* side of the road contributed to the accident. That is, the car first drifted to the left across both lanes of traffic, dropped off the left shoulder (where there should have been shoulder backing to prevent this), then over-corrected to the right side, where it hit the dike (and where there was no recovery area), launched into the air and rolled down the too-steep embankment.[5] The argument carried over into the next day's hearing on the motions in limine, as the trial court considered Caltrans' motion to restrict expert testimony. The court ultimately allowed appellants' experts to testify as to this new aspect of causation, but restricted the evidence upon which the experts could rely to what was available to them when their depositions were taken.

---

[5] Caltrans moved in limine to restrict expert testimony to the opinions given in their depositions, which had been taken approximately a year before trial. Caltrans objected that it was unfair to introduce left-side shoulder backing into the case "at the eleventh hour."

5

The case went to the jury on two components of the allegedly dangerous condition: whether Caltrans had failed to install shoulder backing as required by its plans and whether Caltrans had failed to maintain the embankment, which had allegedly eroded over the years.[6] The jury found for Caltrans on a special verdict, answering "no" to the first question: "Was the property in a dangerous condition at the time of the incident?" in a nine-to-three vote. The court entered judgment on January 9, 2012.

## DISCUSSION

**I.          The Motion for Summary Judgment/Summary Adjudication**

Code of Civil Procedure section 437c, subdivision (f)(1), provides: "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or that *there is no merit to an affirmative defense as to any cause of action*, or both, or that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Italics added.) The statute does *not* authorize a motion for summary adjudication on the ground that an affirmative defense *has* merit. For a defendant seeking to validate an affirmative defense by summary adjudication, the true basis of the motion must be that a cause of action has no merit because an affirmative defense completely disposes of it.[7] This may seem like two different ways of stating the same thing. In this case, however, it was not.

---

[6]          The parties stipulated that liability and causation, including comparative negligence, would be the only issues tried in the first phase of the trial.

[7]          As of January 1, 2012, Code of Civil Procedure section 437c, subdivision (s), permits parties to seek summary adjudication of legal issues other than those specified in subdivision (f)(1) under certain conditions, including a stipulation by the parties and an order from the trial judge. This procedure was, however, not available when Caltrans filed its motion.

The pleadings delimit the scope of the issues to be considered in evaluating a motion for summary adjudication. (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381.) The cause of action attacked in Caltrans' motion for summary adjudication was based on Government Code section 835, which provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under [Government Code] Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (See also *People ex rel. Dept. of Transportation v. Superior Court* (1992) 5 Cal.App.4th 1480, 1485 [elements of cause of action].) As our Supreme Court has explained, "Subdivisions (a) and (b) of [Government Code] section 835 obviously address two different types of cases. . . . [W]hat distinguishes the two cases in practice is who created the dangerous condition. Because an entity must act through its employees, virtually all suits brought on account of dangerous conditions created by the entity will be brought under subdivision (a). In contrast, subdivision (b) can also support suits based on dangerous conditions not created by the entity or its employees." (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 836.)

A public entity can avoid some kinds of liability for a dangerous condition of public property by establishing design immunity, as set forth in Government Code

7

section 830.6.[8] Design immunity is an affirmative defense. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69 (*Cornette*).)

In the second amended complaint, appellants identified the lack of a guardrail, the failure to maintain the steep side slope, the design of the dike on the right side of the road, and the lack of a recovery area immediately outside the right shoulder as creating the dangerous condition of the highway. In their opposition to Caltrans' motion, appellants also raised the absence of shoulder backing as contributing to the dangerous condition. All of these elements, according to the complaint, combined to produce the accident. All were created by public employees within the scope of their employment.

The trial court denied summary judgment because it found triable issues of fact as to whether Caltrans employees created a dangerous condition with respect to the lack of shoulder backing and failure to maintain the embankment. The court granted summary adjudication on the basis of design immunity, but only as to three components of the dangerous condition – the lack of a guardrail, the installation of the dike, and the original design of the embankment.

_____

[8] Government Code section 830.6 provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor. Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design or a standard which reasonably could be approved by the legislative body or other body or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by the legislative body of the public entity or other body or employee, or with a plan or design in conformity with a standard previously approved by such legislative body or other body or employee. In the event that the public entity is unable to remedy such public property because of practical impossibility or lack of sufficient funds, the immunity provided by this section shall remain so long as such public entity shall reasonably attempt to provide adequate warnings of the existence of the condition not conforming to the approved plan or design or to the approved standard. However, where a person fails to heed such warning or occupies public property despite such warning, such failure or occupation shall not in itself constitute an assumption of the risk of the danger indicated by the warning."

8

Caltrans' motion for summary adjudication did not "completely dispose[]" of appellants' cause of action for public entity liability. (See Code Civ. Proc., § 437c, subd. (f)(1); see also *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 96 [cause of action reflects separate theory of liability].) Appellants' cause of action cannot be sliced up into separate segments, because each alleged component could have contributed to the accident. That is, the absence of shoulder backing *and* the lack of a guardrail could have combined to cause appellants' car to roll over. (Cf. *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854 [summary adjudication proper for one of two separate and unrelated causes of action even though pleaded together].) The court should not have granted Caltrans' motion for summary adjudication while there were still portions of the cause of action to be submitted to the trier of fact.

## II. The Trial[9]

### A. Design Immunity

Although the trial court could not pick and choose on a motion for summary adjudication among components of the dangerous condition as alleged in appellants' complaint, it could decide at trial what evidence should go to the jury. A ruling on a motion in limine is an efficient way to implement these decisions. (See *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669-670.)

It is generally undesirable for a trial court to decide substantial questions of law in motions in limine, if only because of the time constraints involved at the beginning

---

[9] Caltrans argued – rather shortsightedly – that appellants have appealed only from the ruling on the motion for summary adjudication and therefore we cannot review anything other than that ruling. This argument is incorrect. The notice of appeal states that the appeal is from a judgment after a jury trial. This notice is broad enough to cover the nonappealable orders issued during the case. (See *Gavin w. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, 668-669.) Appellants' amended notice of appeal also identifies "judgment after an order granting a summary judgment motion" as the basis of the appeal, but the court did not enter a judgment after partially granting the summary adjudication motion. The amended notice of appeal is superfluous, but does not affect the rest of the notice.

Appellants' opening brief specifically referred to the motion in limine that restricted the evidence they could present to the jury and the effect of the ruling on summary adjudication on the subsequent trial as issues on appeal.

9

of a trial. Nevertheless, the court has the inherent power to do so. (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1595; see also *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 6 [damages issue improperly decided on summary adjudication could have been properly reached on motion in limine], overruled on other grounds in *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 103.) When a motion in limine turns on a question of law rather than on evidentiary relevance or prejudice, we review the court's decision de novo. (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1338.)

In this case, design immunity had been thoroughly analyzed and discussed as part of the motions for summary judgment and adjudication and the motion for reconsideration. The trial court was in no danger of having to make an off-the-cuff ruling on a new and unfamiliar subject. Likewise, there was no danger of appellants' being sandbagged by introducing a new issue right before trial.

Caltrans made a motion in limine to exclude certain testimony about the dangerous condition, i.e., the lack of the guardrail, the design of the dike, and the slope of the embankment, citing the court's prior ruling on the motion for summary adjudication. Over appellants' opposition, the court granted this motion. It ruled that appellants could not identify any of the components of the accident as to which the court had already granted summary adjudication as part of the dangerous condition, and they could not mention these components as possible remedies for the dangerous condition that was still in the case. For example, they could not suggest a guardrail as a possible remedy for the allegedly eroded embankment.

Appellants do not contest the exclusion of evidence relating to the original design of the embankment, one of the three bases for the ruling on the motion for summary adjudication. We therefore address the exclusion of evidence relating to the design of the dike and the absence of a guardrail, to ascertain whether Caltrans was entitled to design immunity as to these two components of the accident.

10

To establish design immunity, Caltrans must show (1) a causal connection between the project design and the accident, (2) discretionary approval of the design before construction, and (3) substantial evidence of the reasonableness of the design. (See *Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 727 (*Alvarez*).) In their opposition to the motion for summary adjudication, appellants did not present any evidence to dispute the first two elements of design immunity, and they did not produce any additional evidence at the motion in limine stage to call these elements into question. So at this point in the proceedings, the trial court had a single issue before it – the reasonableness of the design – which the statute has identified as a question for the court. (See Gov. Code, § 830.6) As to this element, the issue is not whether there could be a difference of opinion as to the reasonableness of the design, but rather whether grounds existed for a reasonable public official to approve it. (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 185; *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 941).

The issue before the trial court when considering the motion in limine was therefore not whether there were any triable issues of fact, but rather whether any substantial evidence supported adoption of the design by a reasonable employee. We look at the evidence ourselves to determine whether substantial evidence supports the reasonableness of the design. (See *Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515-526.) "Typically, 'any substantial evidence' consists of expert opinion as to the reasonableness of the design, or evidence of relevant design standards." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1267.)

As to the first element, causation, Caltrans may rely on the allegations of the complaint. (See *Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 550.) Appellants unquestionably alleged that the design of the project – the design of the dike and the absence of a guardrail – contributed to the accident. Accordingly, we consider

11

whether Caltrans established the other two elements of design immunity as to the dike and the guardrail.

### 1. Design of the dike

The construction of Interstate 40 was approved in March 1971 and completed two years later. The slope of the embankment was part of the original design. The portion of the roadway including the accident site was rehabilitated in 2003.[10] As part of the rehabilitation project, existing dikes, which control drainage, were replaced with Type E mountable dikes.[11]

Appellants alleged that the dike was too high, so that the car "trip[ped]" over it and was launched into air after leaving the road on the right side. This allegation established the element of causation. The trial court therefore had to evaluate whether Caltrans had shown discretionary approval of the dike and substantial evidence of the reasonableness of the design.

Caltrans presented evidence, which appellants did not dispute, that the rehabilitation plans were accepted by personnel with discretionary authority to approve the plans. Caltrans also presented evidence of the reasonableness of the dike design. Instead of attacking the design itself, appellants' opposition focused on the lack of shoulder support, which they maintained Caltrans had failed to install next to the dike in 2003. Whether Caltrans failed to follow the 2003 rehabilitation plans with respect to shoulder support for the dike does not affect the original decision to replace the old dike with the newer model. As appellants had no other argument or evidence, Caltrans established the elements of design immunity for the dike.

---

[10] The slope of the embankment was not altered when the road was rehabilitated.

[11] A dike is a concrete channel installed at the side of the road to carry off water. A mountable dike has a sloping front face, so that vehicles can cross it if they run off the road.

## 2.        Absence of a guardrail

When Interstate 40 was constructed in 1973, there was no guardrail at the accident site.  The placement of the guardrails formed part of the original design.  When the road was rehabilitated in 2003, the plans included replacing guardrails and installing additional ones.  Caltrans installed a guardrail just east of where the Aklikokou car ran off the road.[12]  There was, however, no guardrail at the accident site itself.

As with the design of the dike, appellants do not dispute the approval process.  We therefore examine the record to see whether "there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (Gov. Code, § 830.6.)

Caltrans' expert provided substantial evidence that the placement of the guardrails conformed to the standards in place both in 1973 and in 2003.  One of the criteria for placement of a guardrail next to an embankment – and the most important criterion – is that the consequences of hitting the guardrail are less severe than the consequences of what the guardrail is there to prevent – going down the embankment or hitting a fixed object on the other side.[13]  To determine which is likely to be worse where an embankment is involved, Caltrans uses an equal severity slope, in which the steepness of the slope and the height of the embankment are plotted together to locate them on one side or the other of a curve.  Roughly speaking, as the slope becomes steeper and/or the

---

[12]     The purpose of the guardrail installed in 2003 was to prevent vehicles from dropping vertically onto an underpass if they ran off the road at that spot.

[13]     Hitting a guardrail is not a benign event.  The impact itself can cause serious injury.  Deflecting the vehicle back onto the road and possibly into traffic may also cause an accident.  (See *Alvarez, supra,* 79 Cal.App.4th at p. 724 [placing median barriers trades preventing cross-median accidents for impact and deflection injuries].)

13

embankment becomes higher, the more likely it is that hitting the guardrail will be better than going over the embankment.

Using the equal severity slopes for both 1973 and 2003, Caltrans' expert presented evidence that given the slope and height of the embankment at the accident site, hitting a guardrail was worse than going down the embankment.[14] Under these circumstances, Caltrans' standards would require a guardrail at the site if there was a history of over-embankment accidents.

Appellants' expert supplied accident data for two miles on either side of the accident site for the 10 years preceding the accident of 2007. According to appellants' information, during that 10-year period, 37 accidents occurred on the eastbound side of Interstate 40.[15] Of those 37 accidents, seven were run-off-the-road accidents.[16] Of those seven, four took place within a mile of the accident site, and of those four, two took place before the road was rehabilitated in 2003.

To summarize, the evidence showed that a reasonable employee could have adopted a plan that did not call for a guardrail at the accident site in 2003. Taking into account both the equal severity slope and the accident history, an employee could reasonably conclude that a guardrail on the eastbound side of Interstate 40 at that location was not only unneeded, but unsafe.

Appellants argue that design immunity cannot apply to the absence of the guardrail because there is no evidence that Caltrans considered and rejected installing a

---

[14] The expert plotted these coordinates based on a survey of the accident site taken in September 2009, over two years after the accident occurred. If, however, appellants' theories of erosion and lack of maintenance were correct, the slope of the embankment should have been steeper in 2009 than it was in 2007. In any event, appellants did not object to the use of the 2009 survey in determining where the embankment at the accident site occurred on the severity curve.

[15] Appellants claimed that accident data for the westbound side of Interstate 40 should have been considered, but the trial court rejected this claim. Appellants presented no evidence that the slope of the embankment on the westbound side was similar to the slope on the eastbound side or that other differences did not affect the accident rate.

[16] Appellants' data do not indicate which side of eastbound Interstate 40 these vehicles ran off of. They could have run off the road on the left side, onto the median.

14

guardrail at the accident site during the 2003 rehabilitation project. The plans for the rehabilitation project show that Caltrans reconstructed 68,000 feet of guardrail during the project. The inference is inescapable that when Caltrans was deciding where to install guardrails, it was also deciding where *not* to install them. It installed a guardrail just east of the accident site, so it must have been evaluating the area when it was refurbishing the road. Caltrans presented sufficient evidence to support the reasonableness of the approval of these plans.

### B. Loss of Design Immunity

The major difficulty with this case, we believe, stems from the conflation of design immunity, an affirmative defense with the burden on the defendant, and loss of design immunity, which the plaintiff must prove once the public entity has established design immunity. (See *Laabs v. City of Victorville, supra*, 163 Cal.App.4th at p. 1268.) By mixing the two issues together, the parties introduced a great deal of confusion into the case.

Proof of loss of design immunity – after the public entity has achieved it – has three components. The plaintiff must prove, first, that the design has become dangerous because physical conditions have changed; second, the public entity had notice – actual or constructive – of the dangerous condition; and, third, the public entity had reasonable time and the money necessary to remedy the dangerous condition and did not or, lacking the money or the means to fix it, did not attempt to adequately warn about the condition. (*Cornette, supra,* 26 Cal.4th at p. 72.)

Although the court correctly ruled that Caltrans had established the elements of design immunity with respect to the guardrail and the dike, that did not end the matter. Establishing design immunity as to these two aspects of the accident did not necessarily prevent appellants from maintaining – and presenting evidence to the jury – that Caltrans had lost design immunity owing to changed physical conditions after the date when the designs were put into place. This showing was appellants' to make, and

15

our Supreme Court has emphasized that this is a jury question. (*Cornette, supra,* 26 Cal.4th at pp. 73-74.) A CACI jury instruction, No. 1123, supplies the necessary guidance to the jury.[17]

### 1. Loss of design immunity as to the dike

The record contains no evidence that physical conditions changed between 2003, when the dike was installed, and 2007, when the accident occurred, to create a dangerous condition as to the dike. In their opposition to the summary adjudication motion, appellants argued that real danger was absence of shoulder support that should have been laid down when the new type of dike was installed in 2003, not that anything had happened to or around the dike during the intervening four years to make it dangerous.

In essence, appellants did not proffer a loss of design immunity issue with respect to the dike. The issue was, instead, whether Caltrans had followed the 2003 rehabilitation plans with respect to shoulder backing in the area of the dike.

The issue of shoulder backing, or lack thereof, went to the jury, which decided that it did not present a dangerous condition.[18] To the extent appellants alleged that failure to maintain the embankment behind the dike constituted a changed and dangerous condition, that issue too went to the jury, which decided against appellants.

Appellants did not dispute the evidence regarding design immunity for the dike. That is, they did not dispute causation, proper approval, and reasonableness of design. The only change in physical condition appellants even remotely connected with the dike – an embankment Caltrans failed to maintain – the jury rejected as a dangerous condition. Appellants had the opportunity to present their case for liability based on the

---

[17] The directions for use state, "Give this instruction if the public entity defendant is entitled to design immunity unless the changed-conditions exception can be established."

[18] Appellants argued that shoulder backing was part of the 2003 rehabilitation project plan, but was not actually installed. Caltrans' expert testified at trial that it was installed, per the plan.

16

failure to install shoulder backing, on which they based their claim of liability with respect to the dike.

### 2. Loss of design immunity as to the guardrail

Caltrans established design immunity for its decision not to extend the guardrail when it refurbished Interstate 40 in 2003. Therefore the initial decision not to install a guardrail was off the table. Theoretically, however, upon supplying evidence that the physical conditions had changed since 2003 creating a dangerous condition, appellants could have introduced evidence of the possible remedies. One of these remedies was extending the existing guardrail, at a nominal cost.

What was the changed physical condition that could have supported the guardrail extension remedy? Appellants alleged that the embankment had eroded such that its slope had become steeper than originally designed and Caltrans had failed to maintain it, allowing it to become too steep for safety. By extension, then, a guardrail became necessary after 2003 to keep cars in trouble from running onto the now-dangerous embankment.

The maintenance/erosion issue, however, went to the jury. The jury heard testimony from both sides' experts about the measurements they had taken of the slope's steepness, about whether the embankment had eroded, and about whether it had been properly maintained. The jury decided that the embankment did not pose a dangerous condition at the time of the accident.

Even if appellants could have produced evidence showing changed conditions between 2003, when the road was refurbished, and 2007, when the accident occurred, the jury determined that the embankment was not dangerous in 2007. We can reverse a judgment only if the outcome would have been more favorable to the appellant if the error had not been made. (See *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 952; *Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011) 201 Cal.App.4th 1041, 1048.) Assuming

17

that the trial court should have allowed appellants to address extending the guardrail in connection with loss of design immunity, it would have made no difference. Because the embankment did not constitute a dangerous condition, the jury did not reach the issue of a potential remedy for the condition. Therefore evidence regarding the extension of the guardrail would not have changed the outcome.

## DISPOSITION

The order granting summary adjudication is reversed. The judgment after jury trial is affirmed. The parties are to bear their own costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.


18